IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 8, 2009

**STATE OF TENNESSEE v. TROY ALLEN PRUITT**

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40600541      John H. Gasaway, III, Judge**

_____

**No. M2008-02858-CCA-R3-CD - Filed April 28, 2010**

_____

A Montgomery County jury convicted the Defendant, Troy Allen Pruitt, of two counts of aggravated robbery and two counts of fraudulent use of a credit card, and the trial court sentenced him to an effective sentence of fifteen years in the Tennessee Department of Correction ("TDOC").  On appeal, the Defendant contends:  (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when it found the Defendant waived review of the issue of whether recent case law on expert witness testimony entitled him to a new trial.  After a thorough review of the record and applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J.,delivered the opinion of the Court, in which DAVID H. WELLES, and ALAN E. GLENN, JJ., joined.

Jeffry S. Grimes, Clarksville, Tennessee, for the Appellant, Troy Allen Pruitt.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Cameron L. Hyder, Assistant Attorney General; John W. Carney, Jr., District Attorney General; John Finklea, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

    A Montgomery County grand jury indicted the Defendant for two counts of aggravated robbery, one count of aggravated kidnapping, and two counts of fraudulent use of a credit card, all stemming from the robbery of Tennessee Cash Cow on March 20, 2006.

At the Defendant's trial on these charges, the following evidence was presented: Officer John Hutzel, with the City of Clarksville Police Department, testified he was on duty on March 20, 2006, around 1:00 p.m. when he heard an alert over his police radio that a crime had occurred at Tennessee Cash Cow, where his wife, Sabine Hutzel, worked. Officer Hutzel said he immediately drove to Tennessee Cash Cow. He arrived followed closely by Detective Ray Davis, and found one customer, his wife and two other employees present. The two employees present were Tammy Clinard and Valerie Catignani. The officer said that, after ascertaining that everyone was okay, he immediately went to the left side of the building to check for anything moving or anyone leaving. He returned to the Cash Cow and began his initial report. On cross-examination, Officer Hutzel testified he was not involved in any photographic lineups in connection with this case.

Sabine Hutzel testified she was working at Tennessee Cash Cow as the manager on March 20, 2006. She said Tennessee Cash Cow, where she had worked for more than a year, offered title and payday loans, a process that takes between fifteen and twenty minutes per customer. Hutzel said that, around 1:00 p.m., she was in the office of her area manager, Tammy Clinard, when Clinard said, "What's that?" Hutzel looked around and, at first, did not understand what Clinard was referencing, but then saw a man coming in the door. Hutzel said the man was wearing a dark jacket zipped up covering part of his face and had a "darker blue" bandana over the other part of his face so that only his eyes and the bridge of his nose could be seen. The man also wore gloves and pants.

Hutzel remembered that the man wielded a "dark . . . not too large" handgun, told everyone to get on the floor, and he told Hutzel and Clinard to get out of the office. Hutzel's co-worker Valerie Catignani and a customer both immediately complied with the man's request to get on the floor, and Catignani hid under her desk. Hutzel said the man asked Clinard to go to the counter and get the money. Clinard said she had a knee injury and asked the Defendant if she could sit down and Hutzel could go and get the money. The man agreed and placed a red and dark gray backpack on the counter and indicated he wanted the money placed in the backpack. Hutzel said the man stood within a foot of her while Hutzel opened the cash register and got the money out. She said the register contained a cashier's check, and she asked the man if he wanted the check. He said "no" and told her to just give him the bills. The man then asked Hutzel to get money out of the other cash drawer, which she did, and again placed the money in the backpack.

Hutzel testified that, when she finished placing the money in the backpack, the man walked behind the counter and straight to the storage room next to the bathroom in the back. Hutzel said he seemed to "kn[o]w his way around" the store. He then opened the door to the storage room, which was "very small" and "packed with . . . boxes"and told Hutzel to get in the room. The man attempted to close the door but was unable to close the door all the way.

-2-

Hutzel said she heard the bell indicating someone had passed through the front door, and she left the storage room and called 911. Hutzel identified the Defendant as the man who robbed her store in a photographic line-up. Hutzel said she is very good with faces and eyes, and she said she would never forget the Defendant's eyes.

On cross-examination, Hutzel testified that the Defendant wore a dark blue bandana during the crime and that she remembered his eyes. Hutzel said she had seen the Defendant shortly after this crime when she testified at another court proceeding in this case. She told the court during that proceeding that the Defendant had brown eyes.

Tammy Clinard testified that she was the area manager for Tennessee Cash Cow and that she managed ten offices. On March 20, 2006, she was at the Clarksville location she managed when, around 1:00 p.m., the store was robbed. Clinard recalled that Hutzel had just walked into her office to ask her a question when she noticed a man wearing a ski coat, dark blue bandana, and all dark clothing with "everything covered" near the corner of the building. Clinard said the man sprinted through the door and went between the two counters. He yelled for Clinard and Hutzel to exit Clinard's office and for neither of them to use the phone. Clinard said she pushed Hutzel out of the office because she could see a revolver in the man's hand.

Clinard testified that the man, who carried a gray and red backpack, told her to come and empty the cash drawers. Clinard said she had recently had her knee replaced, and she asked the man whether Hutzel instead could retrieve the money. Hutzel placed the money from both cash drawers into the man's backpack. Clinard said she could see only the man's eyes and cheeks. She said he had "extremely red rosy cheeks," which made him look like he had a wind burn or a sunburn. Clinard recalled that, after Hutzel finished placing the money in the backpack, the man placed Hutzel inside a closet. Clinard said the man then took Hutzel's purse, which was underneath a desk, and pilfered through it. He then asked Clinard for her purse. She grabbed her co-worker's purse and handed it to him. The man told them to count to fifty before they called the police. He said the purses were his insurance, saying he now knew how to find the women.

Clinard testified that the police provided her with several photographs of suspects and asked her whether she recognized any suspect as the man who robbed the Cash Cow. She recalled that she identified someone initially but immediately knew that she had identified the wrong person, and she told the police officer that she had identified the wrong person. She never identified anyone else as the robbery suspect. Clinard then identified in court the Defendant as the man who had robbed the Cash Cow.

Valerie Catignani testified she was working at Tennessee Cash Cow when the robbery

in this case occurred. She said she was sitting at the counter assisting a customer when she saw a man wearing a bandana over his face, ski gloves, and a ski jacket and holding a gun walk past the window toward the store's front door. The man entered the store, pointed the gun in her direction, and told her to get on the floor, and she complied. Catignani heard the man ask Clinard to open the cash drawer, and Clinard asked if Hutzel could do it, citing her bad knee. Catignani said she could hear the rest of the robbery but could not see the robber during the robbery. Catignani said she saw only the man's cheeks, which were "really pink," and eyes.

Catignani testified the robber took her purse, which Clinard handed to him during the robbery. Her purse contained her debit card and a post-it note upon which she had written the pin number for her debit card. Catignani testified $200 was taken from her account that day. She also said neither her purse nor any of its contents were returned to her. Catignani identified in court the Defendant as the robber in this case.

On cross-examination, Catignani testified that police officers never showed her any photographs or asked her to identify a suspect. She said the first time she saw the Defendant after the robbery was during the preliminary hearing, where the Defendant wore an orange jumpsuit and sat at a table designated for defendants. Catignani agreed that, at the preliminary hearing, she testified the Defendant's eyes were brown.

Kellie Jackson, the Clarksville County Clerk, testified that the Defendant was the registered owner of the vehicle with license plate LMV 729. The vehicle's model was listed as a gold 1988 Chevrolet.

William Glenn Logsdon testified he was walking his dog on Meadowbrook Drive, which is a dead-end street, on March 20, 2006, shortly past 1:00 p.m. While he walked his dog, he saw a car moving very slowly towards him. He looked to his left and saw someone running through the woods from the direction of Fort Campbell Boulevard, which is where Tennessee Cash Cow is located, carrying a backpack. Logsdon thought it odd that the car was moving so slowly, saying it was moving at "an owl's speed." Logsdon said he was approximately 100 yards from the running person, and he was unable to provide a detailed description. He could only see that the person running had a dark-colored jacket and what appeared to be a red and black backpack. Logsdon said that, as the car passed him, he took note of its license plate number, which he recalled was LMV 729. Logsdon then identified a picture of the Defendant's car as the car he saw driving slowly while he walked his dog. On cross-examination, Logsdon testified he could not identify the car's driver.

Chad Koyama, a detective with the Clarksville Police Department, testified he was the lead detective in this case. He executed a search warrant of the Defendant's home, where

-4-

he found two dark blue bandanas. The detective testified he also went to the bank where Catignani's credit card had been used, and he recovered her card at the main branch of that bank. Detective Koyama said he attempted unsuccessfully to lift fingerprints from the credit card. On cross-examination, the detective testified that Micky Martin was photographed using the credit card at the ATM machine and that Martin was charged as a co-defendant in this case. He conceded that he did not have any photographs of the Defendant committing this robbery.

Eric Love, a detective with the Clarksville Police Department, testified he assisted Detective Koyama in this investigation. The detective testified that, as part of this investigation, he seized the Defendant's wallet, in which he found a lottery ticket and more than $200. On cross-examination, the detective testified he did not know whether the money in the Defendant's wallet was taken from the Cash Cow.

Heather Boyce, an officer with the Clarksville Police Department, testified she patrolled Meadowbrook Drive on March 20, 2006, in response to a report of an armed robbery at Tennessee Cash Cow. As she was doing so, she saw Logsdon walking his Boston Terrier. He gave her a license plate number and asked her to write it down.

Claudia Killebrew, a deputy with the Montgomery County Sheriff's Office, testified she is a K-9 officer. She and her K-9 partner responded to a call about a robbery on March 20, 2006, at Tennessee Cash Cow. The two attempted to find the suspect, who was last seen running to a wooded area behind the building. The deputy said she and her K-9 partner started searching near the back of the building by a chain link fence. Her K-9 picked up a scent, which he followed through the woods, across a ditch, and then to Meadowbrook Drive. The K-9 lost the scent on that road.

Micky Lee Martin testified he was thirty years old and had known the Defendant since they were fifteen or sixteen years old. Martin said he and the Defendant had been best friends since they were young. Martin agreed he had been charged along with the Defendant for aggravated robbery, aggravated kidnapping, and fraudulent use of a credit or debit card. Martin recalled that on the morning of March 20, 2006, he was working on his wife's car at his home when the Defendant, who drove a gold or champagne-colored Corsica, arrived. The Defendant visited for a short time and then left, saying that he would return later. The Defendant returned around 2:00 p.m. as Martin was finishing work on his wife's car. He said he needed brake fluid, so he and the Defendant went to Wal-mart.

On the way, the Defendant told him he had been in a fight and was scared the police were looking for him. He asked Martin to go to an ATM machine where the Defendant would not be seen. Martin drove to an ATM near his home. Martin said the Defendant

showed him a small yellow piece of paper upon which were written two PIN numbers. Beside one of the PIN numbers was the word "old" and beside the other was the word "new." When Martin exited the car at the ATM, the Defendant read the two numbers to him from the yellow sheet, which the Defendant was holding. The number the Defendant read did not work, so Martin told the Defendant to read him the other number. That PIN number worked, and Martin retrieved $200 from the account. The two men split the money between them.

Martin testified that he knew the card did not belong to him or anyone he knew. He recognized the name as female, but he did not recall any more information about the name. He recalled the card was "greenish" and bore the number "50." Martin then examined Valerie Catignani's stolen credit card. He said it was "greenish" with the number 50 in the top corner. He said the card looked like the card he used with the Defendant that day. Martin then identified a photograph of him withdrawing money from the ATM that day.

Martin testified he pled guilty to fraudulently using the credit card and had served over three hundred days in jail. He said, as a result of his guilty plea, the State agreed to drop the aggravated robbery and aggravated kidnapping charges against him. Martin said he had previously been convicted of aggravated robbery and four counts of aggravated burglary.

On cross-examination, Martin agreed he was on probation when he was charged for the offenses in this case. He conceded that he had seven previous felony convictions and that he was, therefore, a Range III offender. As such, he was facing long prison terms if convicted of aggravated robbery or aggravated kidnapping.

The Defendant called Detective Chad Koyama, who testified that a little more than $400 was taken during the robbery and that $200 was taken from Catignani's account using her debit card. He said he showed Clinard a photographic line-up that included the Defendant's picture, and she did not identify the Defendant as the suspect in this case. He agreed both Hutzel and Clinard said the suspect had dark eyes, and the Defendant had blue eyes. On cross-examination, the detective testified that the Defendant's eyes were, in fact, a dark blue. The detective recalled that no witnesses identified Martin at the preliminary hearing as being the man who robbed the Cash Cow.

## II. Analysis

The Defendant presents two issues for review: (1) the evidence is insufficient to sustain his convictions; and (2) the trial court erred when it found the Defendant waived review of the issue of whether recent case law on expert witness testimony entitled him to a new trial.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions for aggravated robbery because the three eyewitnesses only saw the robber's eyes, bridge of his nose, and tops of his cheeks. Further, two of those witnesses said the robber's eyes were brown, and the Defendant's eyes are blue. Therefore, he asserts, the evidence is insufficient to sustain his convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality

of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant in this case was convicted of aggravated robbery, which requires a jury to find beyond a reasonable doubt that the Defendant either knowingly or intentionally committed theft of property, either by violence or by putting the victim in fear, and that the Defendant accomplished this with either: (a) a deadly weapon, (b) display of an article that led the victim to reasonably believe it was a deadly weapon, or © by causing serious bodily injury to the victim. T.C.A §§ 39-13-401 and -402 (2006). Identity of the perpetrator is an essential element of any crime, and therefore must be proven by the State beyond a reasonable doubt. *State v. Rice*, 184 SW.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). We would also note that issues of identity and credibility are classic jury questions. *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005), *perm. app. denied* (Tenn. Feb. 6, 2006). Questions concerning the credibility of the witnesses are resolved by the trier of fact. *Evans*, 108 S.W.3d at 236.

We conclude that the evidence, viewed in the light most favorable to the State, supports the Defendant's convictions for aggravated robbery. The Defendant correctly notes that two witnesses testified that the robber's eye color was brown, whereas his eye color is blue. However, the record contains ample evidence to support the Defendant's conviction: Hutzel testified that she thought the robber's eye color was brown, but she identified the Defendant as the robber from the Defendant's photograph in a photographic line-up that contained only black and white photographs. Clinard identified the Defendant in court as the man who robbed Tennessee Cash Cow. Both women testified the robber, wearing a dark jacket and blue bandana, came into the store brandishing a gun and took the money from the cash drawers. A third eyewitness, who gave a similar description of the robber, said the robber also took her purse and wallet, which contained her debit/credit card and a yellow post-it note with her PIN number. Detectives found two blue bandanas, similar to the one worn by the robber, in the Defendant's home. After the robbery, witnesses reported that the robber, who carried a backpack, fled on foot into the woods behind the Cash Cow. A K-9 officer followed the robber's scent from the Cash Cow, through the woods, to Meadowbrook

Drive, a dead end street that ran along the woods behind the Cash Cow. Shortly after the robbery, a witness saw the Defendant's car driving slowly along Meadowbrook Drive, and a man wearing a dark jacket and carrying a backpack ran from the woods into the car. The Defendant's friend and co-defendant, Martin, testified the Defendant came to his home with Catignani's stolen credit card and a yellow post-it note upon which two PIN numbers were written. Martin used the PIN numbers to retrieve $200 from the account that he then split with the Defendant. When the Defendant was arrested, he was carrying more than $200 in denominations similar to those used by Tennessee Cash Cow. We conclude this evidence sufficiently proves the Defendant's identity as the perpetrator of these offenses and supports the Defendant's convictions for aggravated robbery.

## B. Expert Testimony

The Defendant next contends that the trial court erred when it held that he had waived the issue of whether he could present expert testimony on eyewitness identification. He asserts that, at the time of his trial, the law prohibited defense lawyers from using experts to attack the accuracy of eyewitness identification, citing *State v. Coley*, 32 S.W.3d 831 (Tenn. 2000). He states that, after his trial but while his motion for new trial was pending, the Tennessee Supreme Court issued *State v. Copeland*, 226 S.W.3d 287 (Tenn. 2007), in which the Court held that a trial court could admit such expert testimony if it believed it would substantially assist the jury in the consideration of the issue. In light of *Copeland*, the Defendant amended his motion for new trial.

Based upon *Copeland* and the Defendant's amended motion for new trial, the trial court ruled that the Defendant could present evidence at the motion for new trial hearing about what an expert would have said, had the expert been allowed to testify at the Defendant's trial. At the hearing, John C. Bringham, a psychologist who has studied the factors that affect the accuracy of eyewitness identification, testified about his extensive qualifications. About witness identification in general, Dr. Bringham then testified that there are three stages of eyewitness identification: acquisition; retention; and retrieval. The acquisition stage refers to all those conditions at the time the person acquires the memory of an event. The retention stage refers to the time between the crime and the identification attempt. The retrieval stage refers to a live line-up, a photo line-up, a show-up, or a courtroom appearance, where the person attempts to retrieve the memory and match it against the face of the person or people they are seeing.

In the Defendant's case, Dr. Bringham reviewed the trial transcript, the preliminary hearing transcript, several incident reports, and the photographs shown to the witnesses. With regard to Hutzel, Dr. Bringham testified that Hutzel's heightened state of stress, the involvement of a weapon, and the relatively short duration of the crime call into question

Hutzel's identification of the Defendant. Further, Dr. Bringham noted that Hutzel's description of the robber's eyes as brown, when in fact the Defendant had blue eyes, cast further doubt on the validity of Hutzel's identification. Dr. Bringham also noted problems with the photographic line-up shown to Hutzel by police. He said the photos were black and white, which provided less reliable witness identifications, and were of poor quality. Dr. Bringham said Hutzel also identified the Defendant in court but that "a positive courtroom identification has no meaning in terms of telling us whether or not the person's memory was valid or was accurate because the situation was such that whether or not their memory is accurate, they are very likely to point to that person and say that's the man."

Dr. Bringham also testified about Tammy Clinard, saying that her identification of a different person proved that her memory was "understandably very weak." He said that her in-court identification of the Defendant at trial indicated nothing about the quality of her memory and whether her identification was accurate.

Dr. Bringham agreed that Valerie Catignani's testimony that the Defendant had brown and not blue eyes suggested she perhaps did not get a good look at the Defendant. Dr. Bringham opined that her identification of the Defendant at the preliminary hearing probably was a result of the suggestiveness of the courtroom environment and any information she acquired after the robbery rather than her memory of the robbery itself.

Dr. Bringham testified that jurors usually are not aware that there is little or no relationship between a person's confidence in their memory and the accuracy of their memory.

On cross-examination, the doctor conceded that if the eyewitnesses noticed that a Defendant had a skin disorder, such as rosacea, that caused his skin to look sunburned, it would be a "plus factor" for the reliability of the eyewitness identification.

Considering this evidence, the trial court ruled:

> It is the ruling of this Court that there was no preservation of the issue regarding the admissibility of eyewitness testimony, the reliability of eyewitness testimony by an expert. And notwithstanding the fact that the Col[]ey decision was the law of the land at the time, there could have been a preservation of the issue so that it could have been challenged and dealt with by the Appellate Courts. Therefore, it is deemed waived, and accordingly, the motion for new trial on this issue is denied.

In *State v. Coley*, 32 S.W.3d 831 (Tenn. 2000), a majority of the Tennessee Supreme

Court held that Tennessee Rule of Evidence 702 precluded expert testimony concerning the reliability of eyewitness testimony, observing that "general and unparticularlized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness whose testimony is in question, does not substantially assist the trier of fact." *Id*. at 838. In *State v. Copeland*, 226 S.W.3d 287 (Tenn. 2007), our Supreme Court reversed course and overruled *Coley's* general bar on expert testimony concerning the reliability of eyewitness testimony, holding "that the test in *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997), is sufficient to allow the trial court to properly evaluate the admissibility of expert testimony on the reliability of eyewitness identification." *Copeland*, 226 S.W.3d at 300.

The Defendant in this case was convicted on January 18, 2007, and he was sentenced on May 2, 2007. The Tennessee Supreme Court released the *Copeland* decision on May 23, 2007. The Defendant argues that his case was in the "pipeline" of cases because his motion for new trial had not been decided upon by the trial court, thus his judgment of conviction was not final at the time the *Copeland* decision was released.

When discussing this issue presented in a post-conviction petition, this Court has previously held that:

> Although *Copeland* overruled *Coley's* per se ban on the admission of expert testimony on the reliability of eyewitness identification, it did so via the rules of evidence and not via the due process right to present a defense. Indeed, the *Copeland* court focused entirely on Tennessee Rule of Evidence 702, concluding that "the test in *McDaniel* . . . is sufficient to allow the trial court to properly evaluate the admissibility of expert testimony on the reliability of eyewitness identification." *Copeland*, 226 S.W.3d 300. The high court observed that "[t]he essential role of the judge, as the neutral arbiter in the trial, is to govern the admission of the evidence within the rules, permitting only that expert testimony which substantially assists the jury in its consideration of the issue." *Id.* Thus, the court changed only the manner in which expert testimony on eyewitness identification is analyzed under the Tennessee Rules of Evidence and did not alter appellate review of a claimed due process violation.

*Thomas v. State*, 298 S.W.3d 610, 615-16 (Tenn. Crim. App. 2009). This Court went on to state:

> [W]e . . . hold that *Copeland* did not state a new rule of constitutional law that requres retroactive application. *See Joseph Vermeal v. State*, M2007-01676-

CCA-R3-PC, slip op. At 10, 2008 WL 2648939 (Tenn. Crim. App., Nashville, July 3, 2008) ("Because the rule in Copeland is an evidentiary issue, not a constitutional issue, it does not fall under the constitutional law rule."). As explained above, the *Copeland* court confined its ruling to the admission of evidence under Tennessee Rule of Evidence 702 and did not state a new rule of constitutional law.

*Thomas*, 298 S.W.3d at 616.

In *Vermeal*, this Court examined *Copeland*, again in the post-conviction arena, and concluded:

Although we have been able to locate case law in which a defendant asserts that a new rule of evidence should not be applied to him because the crime was committed prior to the enactment of rule, we have had considerable difficulty locating any case where a defendant, on collateral review, attempts to assert that a new rule of evidence that works to his benefit and established after his trial should be retroactively applied to his trial.

The most closely related issue is ex post facto, such as that addressed in *State v. Bragan*. In *State v. Bragan*, this Court addressed the change in the evidentiary rule concerning spousal competency. 920 S.W.2d 227, 240-41 (Tenn. Crim. App.1995). At the time of the crime in *Bragan*, either the testifying spouse or the non-testifying spouse could invoke the privilege. *Id*. at 240. At the time of trial, however, the rule had been changed to allow only the testifying spouse to invoke the privilege. *Id*. at 240. In an ex post facto analysis, this Court held that a trial applying the new rule was constitutionally permissible. *Id*. at 241 ("[L]aws which change a rule of evidence, but which do not increase the punishment nor change the elements of the offense or the ultimate facts necessary to establish guilt, but only remove existing restrictions on the competency of certain classes of evidence or of persons as witnesses do not constitute ex post facto laws."). *See generally Hopt v. Territory of Utah*, 110 U.S. 574, 589 (1884) (concluding that a Utah law which changed the previous rule that no convicted felon could testify in a criminal case was not an ex post facto law).

It has been generalized by the Pennsylvania Supreme Court that there are four approaches to retroactivity:

One approach is to give the new rule purely prospective effect

so that it is not even applied to the parties in the case in which the new rule is announced. Another approach is to limit retroactive application to the case in which it is announced. A third choice is to apply the new rule to the case in which it is announced and to all cases pending at the time the new rule is announced. A fourth approach is to give the new rule fully retroactive effect. Under this fourth choice, the new rule is applied to the case in which it is announced, to all cases pending at the time the new rule is announced, and to cases which are final at the time the new rule is announced.

*Blackwell v. Pennsylvania*, 589 A.2d 1094, 1099 (1991) (internal citations omitted). The Petitioner would urge us to apply approach four.

In our search to find applicable law as to which approach is applicable to this situation, we found that the Massachusetts Supreme Court specifically stated that a new common law rule of evidence is to be applied to the case in which it was decided on remand and, subsequent to that, only prospectively. *Massachusetts v. Adjutant*, 824 N.E.2d 1, 15 (Mass. 2005). This would utilize approach two. Approach two is sound in this case: if we were to grant *Copeland* retroactive application to cases on collateral appeal, every defendant whose case presented a *Coley* issue and was decided under *Coley* would, arguably, be entitled to a new trial. Such an application could potentially disrupt many long-since settled cases and place an enormous burden on courts. Further the idea could be applied to any number of other issues, thereby rendering final judgments temporary. The Petitioner has presented no authority, and we can find no authority, mandating or suggesting this outcome. We conclude that, because *Copeland* does not apply to the Petitioner on his collateral appeal, he can not take advantage of it in arguing he was denied the right to a fair trial. Therefore, this issue has already been decided on direct appeal, and the post-conviction court was not in error to deny relief.

*Vermeal*, 2008 WL 2648939, at *9-10.

In accordance with our holdings in *Thomas* and *Vermeal*, we conclude that *Copeland* should not apply retroactively to the Defendant's case and that the trial court did not err when it concluded that the Defendant was not entitled to a new trial on this basis.

Further, the defendants in *Vermeal* and *Thomas* attempted at trial to present expert testimony about eye witness testimony, whereas the Defendant in this case did not. Notably,

*Coley* was the law of the land at the time of both of their trials also. The Defendant's case squares more with our decision in *Ronald Dotson v. State*, No. W2007-01654-CCA-R3-PC, 2008 WL 3983109 (Tenn. Crim. App., at Jackson, Aug. 26, 2008), *perm. app. denied* (Tenn. Feb. 17, 2009). In that case, the petitioner did not seek to admit this type of expert testimony and then, in a post-conviction proceeding, contended that this Court should remand his case based on *Copeland*. *Id*. at *5. We first stated that contrary to the petitioner's assertions, "*Copeland* does not require the admission of the testimony of an eyewitness identification expert but instead holds that such testimony is not per se inadmissible." *Id*. at *6. Further, we held that "the petitioner was not denied the opportunity to present such testimony at his trial because he did not seek to admit such testimony." *Id*. We recognize that the trial of the petitioner in *Dotson* was held before *Coley*, however, we find this case instructive in that the Defendant in the case presently before us did not seek to introduce any expert testimony at his trial.

Finally, "[n]o judgement of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a). In *Copeland*, the Tennessee Supreme Court confirmed that a "'final judgment . . . shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment.'" *Copeland*, 226 S.W.3d at 302 (quoting Tenn. R. App. P. 36(b)). For a defendant to prevail on this issue, he must show that the denial of this non-constitutional evidentiary error probably affected the judgment. *See State v. Dotson*, 254 S.W.3d 378, 388 (Tenn. 2008). In considering the whole record, "'[t]he more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome on its merits.'" *Id.* (citations omitted). In the case presently before us, as we noted in the previous section, the evidence was more than sufficient to sustain the Defendant's conviction. In fact, significant evidence, other than the eyewitness testimony, inculpated the Defendant: a man was seen fleeing from the Tennessee Cash Cow and getting into the Defendant's car, which was located on a street behind the woods behind the Tennessee Cash Cow; the Defendant gave Catignani's stolen credit card and a yellow post-it note upon which two PIN numbers were written to Martin; Martin used this credit card to retrieve $200 that he then split with the Defendant; when Defendant was arrested, he was carrying more than $200 in denominations similar to those used by the Tennessee Cash Cow; and two blue bandanas similar to the one worn by the robber were found at the Defendant's home. In light of this evidence, we conclude that the Defendant cannot show that any error in the omission of expert testimony about eyewitness identification more probably than not affected the outcome of his trial  He is not, therefore, entitled to relief on this issue.

### III.  Conclusion

After a thorough review of the record and the applicable law, we conclude the evidence sufficiently supports the Defendant's convictions and that he is not entitled to a new trial based on *Copeland*.  As such, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE